SANGUI BIOTECH INTERNATIONAL, INC., Plaintiff,

v.

Helmut KAPPES, Defendant.

No. 01–B–1424.

United States District Court, D. Colorado.

Jan. 14, 2002.

Jean V. MacHarg, Patton Boggs, L.L.P., Washington, DC, Robert M. Bearman, Patton Boggs, L.L.P., Denver, CO, for plaintiff.

Lisa F. Perfrement, Thomas J. Burke, Jr., Edward T. Lyons, Jr., Jones & Keller, P.C., Denver, CO, Paul G. Bursiek, Jr., Pendleton, Friedberg, Wilson & Hennessey, PC, Denver, CO, for defendant.

## MEMORANDUM, OPINION AND ORDER

BABCOCK, Chief Judge.

Third-party Hermann J. Vohs moves, pursuant to 28 U.S.C. § 1927, for attorney fees and costs from Plaintiff Sangui Biotech International Inc.'s ("Sangui's") attorneys, Patton Boggs LLP, Jean V. MacHarg, Esq., and Robert Bearman, Esq. Specifically, Mr. Vohs requests attorney fees and costs for the period from August 10, 2001, the date he complied with this Court's July 26, 2001 Temporary Restraining Order ("TRO"), to and including August 15, 2001, the date the Order to Show Cause was discharged. Patton Boggs LLP, Jean MacHarg and Robert Bearman oppose the motion. The motion is adequately briefed and oral argument would not materially aid its determination. For the following reasons, I grant Mr. Vohs's motion.

## I. Background

On July 26, 2001, I issued an ex parte TRO requiring Defendant Kappes and all those acting in concert with him to: (1) refrain from taking any measures in furtherance of Defendant's illegal exchange offer scheme; and (2) produce to Sangui the names and addresses of all Sangui shareholders known to them. I further ordered that Plaintiff's Motion for Preliminary Injunction be set for an August 6, 2001 hearing.

On August 6, 2001, Defendant Kappes, through counsel, made a special appearance arguing that I lacked jurisdiction to order a preliminary injunction because he had not been served with process as required by Fed.R.Civ.P. 4. Defendant is a resident of the Federal Republic of Germany. In the case of a citizen of the Federal Republic of Germany, service of process may only be acquired under the provisions of the Hague Convention of the Service Abroad of Judicial and Extrajudicial Documents ("Hague Convention"). Because Defendant had not yet been served with process, I did not have jurisdiction to enter a preliminary injunction against him. However, I found good cause to extend the TRO for an additional ten days.

That same day, Sangui filed contempt papers against Mr. Vohs, alleging that he acted in concert with Mr. Kappes and that he had failed to abide by the terms of the TRO by refusing to produce the names and address of all Sangui shareholders known to him. On August 6, 2001, I issued an Order to Show Cause why Mr. Vohs should not be held in contempt ("OSC") and ordered him to respond by August 15, 2001.

Mr. Vohs has known Defendant Kappes since 1986. Mr. Vohs has been the majority owner and president of Cales Investments, Inc. since 1988. In 1996, Cales Investments entered into a Foreign Distributorship Agreement with a company known as EuroAmerican, which was principally owned by Mr. Kappes. As a result of the Agreement, European shareholders of Sangui opened accounts with Cales Investments.

Mr. Vohs received a copy of the TRO from Sangui's counsel, Mr. Bearman, on Friday, July 27, 2001. Upon his receipt of the TRO, Mr. Vohs telephoned Mr. Bearman and left a message for him. The following Monday, Mr. Vohs sent Mr. Bearman an e-mail asking him "to please respond to ... the question I left on your voice mail last Friday." *Sangui's Response, Exhibit 4.* Mr. Vohs and Mr. Bearman spoke later that day and Mr. Bearman told Mr. Vohs that he was bound by the TRO. Mr. Vohs informed Mr. Bearman that he did have names and addresses of Sangui shareholders, but that Mr. Kappes had instructed him not to give that information to Sangui. Mr. Vohs "indicated that he would consult with [his] legal counsel and respond to [Mr. Bearman] in a couple of days." *Sangui's Response, Exhibit 4; see also Sangui's Response, Exhibit 2, Vohs's Affidavit* ¶ 12. A few days later, on August 1, 2001, Mr. Bearman wrote Mr. Vohs a letter confirming their telephone conversation. In the letter, Mr. Bearman wrote:

> You informed me that you have in your possession addresses of Sangui shareholders that have been withheld from Sangui's transfer agent by Mr. Kappes and Euro–American Securities. I asked you to provide those addresses to me as Sangui's attorney immediately. You refused and stated that Mr. Kappes had instructed you to not provide that information to Sangui.
>
> We urge you again to provide to us immediately the names and addresses of the Sangui shareholders that are in you possession, custody or control. If you fail to do so, you may be deemed in contempt of the Order of the Court and subject to severe consequences.

*Sangui's Response, Exhibit 6.*

On August 6, 2001, Sangui filed a motion for an order to show cause why Mr. Vohs should not be held in contempt. Attached to the motion was an affidavit of Mr. Bearman, in which he stated:

4. I sent a copy of this Court's Temporary Restraining Order ("TRO") to Mr. Vohs on the day it was issued and spoke with Mr. Vohs by telephone on July 30, 2001.

5. I informed Mr. Vohs that I was one of the attorneys for Sangui.

6. Mr. Vohs confirmed that he had received the Court's TRO.

7. Mr. Vohs admitted that he has in his control addresses of Sangui shareholders that have been withheld from Sangui's transfer agent.

8. Mr. Vohs refused to deliver that information to me.

*Motion for Order to Show Cause, Bearman Affidavit* ¶ 4–8. Based on the information in Mr. Bearman's affidavit, I issued an OSC why Mr. Vohs should not be held in contempt.

On Friday, August 10, 2001, Mr. Vohs's counsel delivered a shareholder list to Sangui. The cover letter from Mr. Vohs's counsel stated that "Mr. Vohs will cooperate fully with you in explaining the mechanics of preparing this list." *Mr. Vohs's Motion, Exhibit 2A.* The shareholder list was accompanied by a letter from Ms. Vohs stating that he had "no way of ascertaining what status former customers have with regards to share ownership in Sangui Biotech International, Inc. It could be that they transferred or sold their shares or that the address is no longer current." *See id.* On August 13, Mr. Vohs filed his Response to the OSC and he filed a short supplemental brief the next morning. In his Responses, Mr. Vohs denied having acted in concert with Mr. Kappes but stated that he nonetheless fully complied with the TRO by supplying the names and ad-

dresses of all Sangui shareholders known to him as of July 26, 2001.

On August 14, Sangui's counsel, Ms. MacHarg telephoned Mr. Vohs's counsel and asked if he and Mr. Vohs intended to appear at the hearing scheduled the next day. Ms. MacHarg proposed that if Mr. Vohs was to cooperate fully with Sangui, then Sangui would withdraw its contempt motion. Ms. MacHarg wrote a formal letter explaining her offer. The letter stated:

> We have proposed an agreement pursuant to which Sangui would withdraw its pending motion to hold Mr. Vohs in contempt in [sic] the Court's July 26, 2001 TRO in exchange for Mr. Vohs' cooperation with Sangui by providing us with full and candid information concerning (a) the shareholder list that Mr. Vohs·has delivered to Sangui and other information about Sangui's shareholders that is known to him; (b) Mr. Vohs' relationship and dealings with Mr. Kappes and/ or EuroAmerican and/ or others associated with either of them; and (c) the Proteo/ Sangui exchange offer. The above-described subjects should not be read or understood narrowly. What we seek to talk to Mr. Vohs about is what he knows about the three topics broadly defined above. You can be assured that if Mr. Vohs acts in good faith in responding to our questions, then Sangui will reciprocate in good faith by withdrawing its pending motion to hold Mr. Vohs in contempt. We would expect Mr. Vohs to continue to cooperate with Sangui on a going forward basis by answering any additional questions we might have even after tomorrow's hearing.

*Vohs' Motion, Exhibit 1.*

However, neither Mr. Vohs nor his counsel responded. The next morning, Mr. Vohs and his counsel appeared for the OSC hearing. Mr. Vohs testified and explained how he assembled the shareholder list. Based on his testimony, I discharged the OSC against him.

Now, Mr. Vohs moves for his attorney fees and costs incurred in defending the OSC from the period of August 10, 2001, the date he complied with the TRO, to and including August 15, 2001, the date the OSC was discharged.

## II. Standard

■ Attorney fees are only awarded in specific situations. 28 U.S.C. § 1927 states, in pertinent part, that:

> [a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. Under the plain language of § 1927, in order to award sanctions, the court must find, first, that the attorney engaged in "unreasonable and vexatious" conduct, and second, that the "unreasonable and vexatious" conduct "multiplied the proceedings." Section 1927 awards are appropriate "only in instances evidencing a serious and standard disregard for the orderly process of justice." *White v. American Airlines, Inc.,* 915 F.2d 1414, 1427 (10th Cir.1990)(internal quotations omitted); *see also Miera v. Dairyland Ins. Co.,* 143 F.3d 1337, 1342 (10th Cir.1998); *Braley v. Campbell,* 832 F.2d 1504, 1512 (10th Cir.1987)(en banc); *Dreiling v. Peugeot Motors of Am., Inc.,* 768 F.2d 1159, 1165 (10th Cir.1985). "Actions are considered vexatious and unreasonable if the attorney acts in bad faith ... or if the attorney's conduct constitutes a reckless disregard for the duty owed by counsel to the court." *Shackelford v. Courtesy Ford, Inc.,* 96 F.Supp.2d 1140, 1144 (D.Colo.2000). Sanctions are appro-

priately imposed under § 1927 on counsel who repeatedly attempt to litigate matters that have been decided or who continue to pursue claims that are no longer reasonable. *See Dreiling,* 768 F.2d at 1165–66 (upholding sanctions against attorney who continued to assert claims "long after it would have been reasonable and responsible to have dismissed the claims"); *Limerick v. Greenwald,* 749 F.2d 97, 101–02 (1st Cir.1984)(per curiam)(sanctioning counsel who, among other things, brought repetitive motions and sought to relitigate matters already concluded).

 Subjective bad faith is not necessary to trigger sanctions under § 1927. *See Braley,* 832 F.2d at 1512. Excess costs, expenses, and attorney fees are imposable against an attorney personally under § 1927 for conduct that, "viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court." *Id.* "A lawyer's reckless indifference to the law may impose substantial costs on the adverse party, [and § ] 1927 permits a court to insist that the attorney bear the costs of his own lack of care." *Id.* at 1511 (internal quotations omitted).

### III. Discussion

#### A. Relevant Parties

As an initial matter, I note that Sangui apparently believes that Mr. Vohs's motion is against it (the corporation) as well as its counsel. However, a *careful reading of* Mr. Vohs's motion reveals that it is directed only to Sangui's attorneys, specifically the law firm Patton Boggs LLP, and attorneys Jean MacHarg and Robert Bearman. *See Vohs's Motion* at 1.

I next consider whether a law firm, such as Patton Boggs LLP, can be liable under § 1927. The specific wording of § 1927 indicates that "[a]ny attorney" may "be required by the court to satisfy personally" the costs and attorney fees.

Prior to 1989, in the context of Rule 11 sanctions, the Tenth Circuit held that "[u]nder general legal principles a corporation is liable for the acts of its employees committed within the scope of employment" and, therefore, "it is appropriate to levy attorney's fees against a firm that is responsible for the pleadings signed by its employees." *Glass v. Pfeffer,* 849 F.2d 1261, 1267 (10th Cir.1988). However, in 1989, also in the context of Rule 11 sanctions, the United States Supreme Court held that law firms are not responsible for the signatures of their attorneys. *See Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 125–127, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989).

The Court ruled that the general legal rules regarding corporate liability did not apply, explaining that:

> We are not dealing here, however, with common-law liability, but with a Rule that strikingly departs from normal common-law assumptions such as that of delegability. The signing attorney cannot leave it to some trusted subordinate, or to one of his partners, to satisfy himself that the filed paper is factually and legally responsible; by signing he represents not merely the fact that it is so, but also the fact that he personally has applied his own judgment. Where the text establishes a duty that cannot be delegated, one may reasonably expect it to authorize punishment only of the party upon whom the duty is placed. We think that to be the fair import of the language here.

*Pavelic & LeFlore,* 493 U.S. at 125, 110 S.Ct. 456.

Subsequent to the *Pavelic* decision, in 1993, Rule 11 was amended to permit courts to sanction "attorneys, law firms or parties," instead of limiting the sanctions

to the signer of documents. *See* Rule 11(c). Now it is clear that Rule 11 sanctions may be imposed on law firms. Additionally, it is clear that a court may use its inherent discretion to impose sanctions on a law firm. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 50, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)(stating that a court may use its inherent power to reach misconduct that is beyond the scope of Rule 11 and § 1927). However, courts are divided on whether sanctions under § 1927 may be imposed on law firms. *Compare Moore v. Keegan Mgmt. Co.,* 154 F.R.D. 237, 242–43 (N.D.Cal.1994)(court may use § 1927 to impose sanctions on law firms), *rev'd on other grounds by* 78 F.3d 431 (9th Cir. 1996); *Brignoli v. Balch Hardy & Scheinman,* 735 F.Supp. 100, 102 (S.D.N.Y.1990)(imposing sanctions on law firm under 28 U.S.C. § 1927) *with Lockary v. Kayfetz,* 974 F.2d 1166 (9th Cir.1992)(noting that sanctions could not be imposed on a law firm pursuant to Rule 11 and § 1927, but that a court could use its inherent power to impose such sanctions).

■ I conclude that based on the wording of § 1927 and the reasoning in *Pavelic,* sanctions under § 1927 may not be imposed on law firms. Section 1927's wording specifically limits its application to "attorneys." Furthermore, the statute indicates that an attorney may be required to "satisfy personally" any award. Additionally, the reasoning of *Pavelic* supports the conclusion that the duties imposed by § 1927 are not delegable. Therefore, any award under § 1927 will not be imposed on the law firm Patton Boggs, but instead on the individual attorneys.

## B. Section 1927 Sanctions

Mr. Vohs believes that Sangui's counsel should not have initiated contempt proceedings against him based on the allegedly misleading affidavit of Mr. Bearman and at the very least Sangui's counsel should have dismissed their motion to hold him in contempt on August 10, 2001, when he complied with the TRO.

### (1) Mr. Bearman's Affidavit

First, Mr. Vohs argues that Sangui never should have initiated contempt proceedings based on Mr. Bearman's allegedly misleading affidavit. In his affidavit, Mr. Bearman stated that "Mr. Vohs refused to deliver [the addresses of Sangui shareholders in his control] to me." *Motion for Order to Show Cause, Mr. Bearman's Affidavit* at ¶ 8. This statement infers that Mr. Vohs unequivocally refused to supply the list of Sangui shareholders.

■ During the August 15, 2001 OSC hearing, I stated the following:

> I am, I will say, frankly, concerned about what is at the very least overstatement in the plaintiff's papers with regard to Mr. Vohs, if not misleading statements, for example the assertion that he [Mr. Vohs] unequivaocally refused to supply this list. And the events and exhibits attached to the response show that this was not an unequivocal refusal and that he took reasonable steps to contact competent counsel in order to expeditiously resolve his position vis-a-vis the Temporary Restraining Order.

*August 15, 2001 Hearing Transcript* at 21–22. The overstatements—and perhaps even misleading statements—in the affidavit were material to the motion for an order to show cause why Mr. Vohs should not be held in contempt. Such overstatements constitute a reckless disregard for the duty owed by counsel to the court. Mr. Bearman knew, at the time he submitted his affidavit, that Mr. Vohs had not unequivocally refused to supply the list of

Sangui shareholders. Mr. Bearman also knew that Mr. Vohs had diligently attempted to contact him after receiving a copy of the TRO and that Mr. Vohs had indicated he needed to talk to an attorney before releasing any shareholder information. Such information should have been disclosed to the court. I consider the failure to disclose such information to be vexatious and unreasonable and the conduct multiplied the proceedings because it resulted in an OSC being issued and a hearing held.

### (2) Ms. MacHarg's Letter

■ Ms. MacHarg's letter to Mr. Vohs on August 14, 2001 states that Sangui will dismiss its contempt motion against Mr. Vohs if he cooperates fully with Sangui's requests, including full and candid information concerning: "(1) the shareholder list that Mr. Vohs has delivered to Sangui and other information about Sangui's shareholders that is known to him; (2) Mr. Vohs' relationship and dealings with Mr. Kappes and/ or EuroAmerican and/or others association with either of them; and (3) the Proteo/Sangui exchange offer." *Mr. Vohs's Motion, Exhibit 1.* The letter is disturbing because it indicates that Sangui will dismiss the contempt motion only if Mr. Vohs provides additional information to Sangui, beyond the information that is required by the TRO. The TRO, upon which the OSC was based, only requires Mr. Vohs to supply the names and addresses of Sangui shareholders known to him. Mr. Vohs provided such list on August 10, 2001. However, Ms. MacHarg's letter did not simply request information on how such list was compiled—which Mr. Vohs had volunteered to share—but instead sought information which exceeded the parameters of the TRO and OSC. Such demands were unreasonable and vexatious and multiplied the proceedings because Sangui should have dismissed its contempt

motion when Mr. Vohs complied with the requirements of the TRO. Instead, the letter is evidence that Sangui's counsel had an ulterior motive for continuing with the contempt proceedings—mainly to harass Mr. Vohs and coerce him into providing more information than that which was required under the TRO. Accordingly, the actions of Sangui's counsel warrant sanctions under § 1927.

Accordingly, I ORDER THAT:

(1) Mr. Vohs's 28 U.S.C. § 1927 motion is GRANTED; and

(2) upon filing pertinent documentation within 10 days from the date of entry of this Order, Mr. Vohs is awarded reasonable attorney fees and costs, payable jointly and severally by Plaintiff's counsel, incurred by him in defending against the OSC for the period from August 10, 2001 to and including August 15, 2001, as well as reasonable attorney fees and costs incurred in filing this motion for an award of attorney fees and costs under 28 U.S.C. § 1927.