In re **INTERCORP INTERNATIONAL, LTD., Debtor.**

No. 03–16625(SMB).

United States Bankruptcy Court, S.D. New York.

May 24, 2004.

J.P. Morgan Chase Legal Department, James D. Greenhalgh, of Counsel, New York City, Burke, Warren, Mackay & Serritella, P.C., LeAnn Pedersen Pope, Edward J. Lesniak, Stephen R. Meinertzhagen, of Counsel, Chicago, IL, Co–Counsel to Chase Mortgage Holdings, Inc.

Deirdre A. Martini, Tracy Hope Davis, of Counsel, New York City, United States Trustee.

Rosenberg, Musso & Weiner, Bruce Weiner, of Counsel, Brooklyn, NY, Attorneys for Debtor.

## MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SANCTIONS

STUART M. BERNSTEIN, Chief Judge.

Chase Mortgage Holdings, Inc. ("Chase"), the holder of a mortgage on the debtor's principal asset, alleged that the debtor filed its chapter 11 petition in bad faith. In response to Chase's motion, the Court converted the case to one under chapter 7. By separate motion and relying on the same allegations of bad faith, Chase also sought sanctions against the debtor, the debtor's principal, Steven C. Sanford, the debtor's attorney in this proceeding, Bruce Weiner, Esq., and Weiner's law firm, Rosenberg, Musso & Weiner. For the reasons that follow, the motion is granted.

## BACKGROUND [1]

### A. Acquisition of the Property

In May 1979, Louis Fink purchased certain property located at 2750 Benedict Canyon Drive, Beverly Hills, California 90210 (the "Property"). Fink was the father of Steven C. Sanford, the president, director and indirect shareholder of the debtor. In January 1995, Fink executed a Note and Deed of Trust in favor of Chase Mortgage Services, Inc., f/k/a Chase Manhattan Mortgage Corporation (Delaware), encumbering the Property in the principal sum of $960,000.00.[2] In February 1995, Fink conveyed the Property to the Louis Fink Realty Trust (the "Fink Trust"). Sanford is the sole beneficiary and co-trustee of the Fink Trust, and has used the Property as his personal residence since 1979.

---

1. The facts are primarily derived from the documents attached as exhibits to the *Motion of Secured Creditor Chase Mortgage Holdings, Inc. to Convert Case to Chapter 7 Pursuant to 11 U.S.C. § 1112(b), or, in the Alternative, for Modification of Automatic Stay Pursuant to 11 U.S.C. § 362(d)(2), or, in the Alternative, to Dismiss Pursuant to 11 U.S.C. § 1112(b),* dated Dec. 10, 2003, which was filed in the main case (ECF Doc. # 12), and the *Defendants' Motion for Mandatory Abstention as to Intercorp's Adversary Proceeding, Pursuant to 28 U.S.C. § 1334(c)(2), or, in the Alternative, for*

*Permissive Abstention as to Intercorp's Adversary Proceeding, Pursuant to 28 U.S.C. § 1334(c)(1),* dated Dec. 30, 2003, which was filed in the adversary proceeding (ECF Doc. # 3) entitled *Intercorp Int'l, Ltd. v. J.P. Morgan Chase & Co., et al.,* No. 03–93639.

2. The Note and Deed of Trust were subsequently transferred to the Chase Manhattan Bank, now known as JPMorgan Chase Bank, and then to Chase Mortgage Holdings, Inc. For ease of reference, "Chase" refers to the holder of the Note and Deed of Trust.

## B. The California Litigation

After Fink died in January 1997, the mortgage, tax and insurance payments under the Note and Deed of Trust ceased. In January 2000, Chase's loan servicing agent (the "Agent") issued a Notice of Default, the first step under California's statutory scheme for non-judicial foreclosures. *See* CAL. CIV. PROC. CODE §§ 2924, *et seq.* (West 1993).

In April 2000, the debtor, SCS Management Company International ("SCS"), the debtor's ultimate parent, and the Fink Trust filed a lawsuit in California state court against the Agent, Chase and others.[3] The original Complaint asserted four claims based on the following two representations (the "Representations") that Chase's loan officer supposedly made at the time of the execution of the loan documents: (1) in the event of a default, Chase would initially look to Fink's assets for repayment, and would look to the Property only if Fink's assets were insufficient, and (2) Chase would charge interest at the Prime Rate minus 2% during the first year, and at the 11th District rate thereafter.

The first of the four causes of action alleged a breach of contract based upon the Representations. The second sought a judicial declaration directing the defendants to comply with the Representations as well as certain other legal requirements. The third cause of action sought to enjoin the defendants from proceeding with the foreclosure sale of the Property. Finally, the fourth cause of action demanded rescission based upon the Representations. In June 2000, the plaintiffs in the California action obtained a preliminary injunction restraining the defendants from selling the Property.

The defendants subsequently moved for summary judgment, and on February 14, 2001, the California court issued a tentative ruling. The court granted summary judgment dismissing the first and second causes of action, holding, *inter alia*, that the non-tort claims based on the Representations were barred by the parol evidence rule. The court refused, however, to dismiss the injunction and rescission claims. The court concluded that neither the parol evidence rule nor the statute of limitations barred the rescission claim. Since the rescission claim remained, the court declined to vacate the existing preliminary injunction.

On November 25, 2002, the court granted the plaintiffs leave to file an amended complaint. The amended complaint included three causes of action, and relied, in part, on new theories. The first count sought declaratory relief. It charged, in the main, that the Agent lacked the authority (a) to issue the default and acceleration notices under the Deed of Trust, rendering them a nullity, (b) to foreclose, or (c) to receive any of the proceeds. The second claim, relying on the same facts, sought damages based on wrongful foreclosure. Finally, the third claim sought rescission of the Note and Deed of Trust based on the Representations. On February 28, 2003, Judge Hiroshige dismissed the second and third causes of action. The wrongful foreclosure claim was not ripe because no foreclosure had occurred. Furthermore, the court changed its earlier determination, and concluded that the parol evidence rule also barred the rescission claim.

---

**3.** According to the complaint (¶ 15), after Fink acquired the Property, he leased it to SCS, its subsidiaries and affiliates, and Sanford for twenty-five years. No written copy of the lease has been produced. In fact, the debtor was not even formed until 1993, or fourteen years after the lease was supposedly executed.

At this point, only two issues remained to be tried. The plaintiffs continued to press their principal argument that the Agent lacked standing to serve the various default and acceleration notices, or prosecute the foreclosure. In addition, the plaintiffs now also argued that the defendants had violated California's "one action" rule—and thereby waived their security—by seeking to foreclose the mortgage and also obtain a personal judgment against the plaintiffs.

On June 2, 2003, the California court began a bench trial on these issues, and following the conclusion of the trial, issued its "Tentative Decision" on September 10, 2003, in favor of the defendants on both questions. The court found that the various notices and warnings sent by the Agent were accurate,[4] and that the Agent had the authority, under the relevant agreements with Chase, to issue the notices and prosecute the foreclosure.

The court also found that the plaintiffs failed to prove a violation of California's "one action" rule. They based this claim on the defendants' earlier motion to increase the injunction bond. The court concluded that the motion did not constitute an election of remedies, or a suit both to foreclose the mortgage and recover a money judgment.

On or about September 29, 2003, the defendants submitted their proposed Statement of Decision in accordance with California law. The Court signed the Statement of Decision on October 28, 2003, confirming the findings and conclusions in the Tentative Decision. The Statement of Decision also directed the defendants to prepare a proposed judgment.

Unbeknownst to the California court, the debtor had filed its chapter 11 petition in this Court on October 23, 2003. The California court probably became aware of the filing when it received the debtor's Notice of Removal of Civil Action [to the California bankruptcy court] and Stay Order on October 29, 2003. The California court issued a Minute Order staying the legal effect of the Statement of Decision "until the outcome of the matter subject to the Notice of Removal."

## C. The New York Class Action

In or about January 2003, the Fink Trust and the debtor commenced a class action in New York State Supreme Court against other Chase affiliates as well as William B. Harrison, Jr., the president and chief executive officer of J.P. Morgan Chase & Co. and J.P. Morgan Chase Bank. The lawsuit challenged the defendants' allegedly deceptive practice of commencing or threatening foreclosure proceedings in the name of a Chase entity that did not own the debt and was not a creditor. *Louis Fink Realty Trust v. Harrison*, No. 03 Civ. 2642(HB), 2003 WL 22595555, at *1 (S.D.N.Y. Nov.7, 2003). The plaintiffs also argued that Chase had violated California's "one action" rule. *Id.* at *3. These were the same claims leveled against the defendants in the California action, and ultimately rejected by the California court.

The New York action was removed to the United States District Court. In a decision dated November 7, 2003, District Judge Harold Baer· dismissed the federal claims, refused to exercise supplemental jurisdiction over the non-federal claims, and dismissed the action. *Id.* at *4.

---

4. The California plaintiffs maintained that the notices and warnings had misrepresented the identity of the owner of the Note and the Deed of Trust. The California court expressly rejected this argument after trial.

## D. The Bankruptcy Petition

Although the debtor was a plaintiff in the California and New York actions, its interest in the Property was unclear. One thing that was clear, however, was that the debtor did not own the Property; the Fink Trust did. This changed on October 22, 2003, less than one month after the California court ruled against the plaintiffs on the remaining two issues. On October 22, 2003, a quitclaim deed conveying the Property from the Fink Trust to the debtor was recorded.[5] The next day, the debtor filed its chapter 11 petition in this Court. The petition was signed by Bruce Weiner, Esq., of Rosenberg, Musso & Weiner and by Sanford, as President, Treasurer, Secretary and Director of the debtor.

The schedules filed with the petition identified the Property as the only asset of the estate. The schedules also listed six unsecured claims, two of which were held by Sanford and the Fink Trust in "unknown" amounts. The other four creditors appeared to be lawyers or accountants, and the aggregate liquidated debt totaled $460,124.08.

The schedules and statement of financial affairs were filed on November 18, 2003. In addition to the Property, the schedules listed other assets: home furnishings and other household items located in the Property ($51,000.00); a 20–25% contractual interest, valued at $1 million, in a judgment, exceeding $20 million, against Dwight Lundell, and other contingent and unliquidated claims valued at $1.5 million. The schedules did not identify the unliquidated claims, and directed the reader to an attachment. The only attachment related to question four of the statement of financial affairs, dealing with lawsuits to which the debtor was a party. The attachment listed five litigations, including the California action, the dismissed New York action, and three other actions against California lawyers. The attachment specifically named the debtor as a plaintiff in only one of these three actions.

## E. The Adversary Proceeding

On December 3, 2003, the debtor commenced an adversary proceeding in this Court against Chase (including its predecessors), the Agent and Chase's corporate parent and several other affiliates. The complaint contained seven claims for relief, and largely rehashed the claims previously dismissed by the California court.

The first count maintained that the defendants lacked standing to foreclose, and should be enjoined from foreclosing. As noted, the California court rejected this claim after trial.

The second count repeated the wrongful foreclosure claim dismissed by the California court in February 2003.

The. third claim sounded in negligent misrepresentation, and sought relief based on the same Representations that were the subject of two decisions of the California court. The California court had already dismissed a rescission claim, based on fraud, and the negligent misrepresentation claim was a variant of the dismissed fraudulent inducement claim.

The fourth claim alleged violations of the "one action" rule. This claim was also rejected by the California court after trial.

The fifth claim alleged unfair and deceptive trade practices under California and New York law, arising out of the Agent's unauthorized acceleration and default notices, and its actions in connection with the foreclosure. Although these specific theories were not argued in California, the California court rejected their underpin-

---

5.  Sanford had executed the quitclaim deed nine days before.

ning when it concluded that the Agent had the authority to issue the notices and warnings and take the actions complained of.

The sixth claim, sounding in fraud and deceit, was also based upon the allegedly misleading acceleration warnings, default notices and non-judicial foreclosure proceedings. The California court had determined, after trial, that the notices were not misleading.

The last claim, based on the California Consumers Legal Remedies Act, sought damages, costs and attorneys' fees based on the omissions and non-disclosures in the acceleration warnings, the default notices and the foreclosure proceedings. As noted, these had been determined by the California court not to be misleading.

The defendants in the adversary proceeding moved for abstention. At oral argument, the debtor's pre-petition counsel conceded that all of the issues in the adversary complaint had been raised and decided by the California court in favor of other Chase affiliates.

> THE COURT: They [the defendants] are telling me that there are no claims asserted in the adversary proceeding which have not been asserted and dealt with for that matter in the California Court, and I certainly have not heard any and have not seen any.
>
> MR. WISSNER–GROSS: I think it is probably correct, if you are looking at the pleadings, Your Honor.
>
> THE COURT: That is what I am looking at. [It's] a good place to start.

(Transcript of hearing, held Feb. 3, 2004, at 34.)

Counsel, nevertheless, attempted to distinguish the California and New York proceedings in two ways. First, the amount of the debt was in dispute, and the dispute had never been presented to the California court. Second, the holder of the Note and Deed of Trust, Chase Mortgage Holdings, Inc., was not a party to the California action. Both arguments were rejected. The debtor's attorney conceded that the dispute regarding the amount of Chase's claim was not raised in the adversary complaint.[6] (*Id.* at 23.) Furthermore, at some point, collateral estoppel would prevent the debtor from relitigating against the new Chase defendants the issues previously decided by the California court in favor of the other Chase defendants. (*Id.* at 34–35.) Following oral argument, the Court granted the defendants' abstention motion in the exercise of its discretion. (*Id.* at 35–37.)

**F. The Motion to Convert or Dismiss**

■ On December 12, 2003, Chase filed a motion seeking three alternative forms of relief: conversion, dismissal or relief from the stay to foreclose.[7] The undisputed evidence showed that the debtor had not conducted any operations for years. The Fink Trust, a non-business trust, was ineligible to file a bankruptcy petition, *see In re Secured Equipment Trust of Eastern Air Lines, Inc.,* 38 F.3d 86, 89 (2d Cir. 1994), and had transferred the Property to the debtor, which was eligible, one day

---

**6.** The debtor implied that it could not have litigated the disputed debt in California prior to the completion of the non-judicial foreclosure. This is not correct. The California plaintiffs could have sought injunctive relief in state court. *Cf. Jessen v. Keystone Sav. & Loan Ass'n,* 142 Cal.App.3d 454, 191 Cal. Rptr. 104 (1983)(recognizing the power to enjoin a non-judicial foreclosure sale where the amount of the debt was in dispute, but affirming the lower court's refusal to restrain the sale in question).

**7.** The automatic stay did not apply to the California action which had been commenced by the debtor and its non-debtor affiliates.

before the petition date. (*See* Transcript of hearing, held Mar. 9, 2004, at 6, 13.) No mortgage or tax payments had been made for the Property for over seven years, and the debtor's principal, Sanford, had lived at the Property, rent-free, all this time. (*See id.* at 15.) In fact, he continued to occupy the Property rent-free after the petition was filed, in possible breach of his fiduciary duty to maximize the potential rental revenue that the Property might generate for the debtor and its creditors. (*See id.* at 22–23.) The debtor filed the case just as the California court was about to enter judgment in favor of the Chase defendants, and removed the California action to the California bankruptcy court.[8]

The circumstances surrounding the transfer of the Property to the debtor and the filing of the petition implied that these steps were intended to frustrate Chase. (*Id.* at 25–27.)

■ Further, there was no business to reorganize, and the case had all the badges of a bad faith filing identified in *C–TC 9th Ave. P'ship v. Norton Co. (In re C–TC 9th Ave. P'ship),* 113 F.3d 1304 (2d Cir.1997). The Property was the debtor's only significant asset. The debtor had no business operations. Its only creditors, other than Chase, were professionals. The case was filed on the eve of the entry of judgment that would have paved the way for Chase's foreclosure. The debtor had no cash flow. The debtor had no employees. Except for the amounts due under the mortgage, the debtor had no operating expenses.[9] Accordingly, the Court granted Chase's motion, and converted the case to chapter 7.

### G. The Sanctions Motion

Chase also filed the instant motion seeking sanctions under FED. R. BANKR. P. 9011, 28 U.S.C. § 1927 and the Court's inherent authority based on the same conduct. The Court reserved decision.

### DISCUSSION

### A. Introduction

■ FED. R. BANKR. P. 9011, 28 U.S.C. § 1927 and 11 U.S.C. § 105 each permit the imposition of sanctions for certain types of wrongful conduct, including the bad faith filing of a bankruptcy petition. The Court has already converted this case based on the ground that it was filed in bad faith. Several courts have observed, however, that the standards governing dismissal or conversion of the case under 11 U.S.C. § 1112(b) differ from those governing the imposition of sanctions, *FDIC v. Fadili,* 165 B.R. 58, 60 (D.Mass.1994), *In re Park Place Assocs.,* 118 B.R. 613, 618 (Bankr.N.D.Ill.1990), and courts have been reluctant to adopt a *per se* rule that the determination of a bad faith filing requires the imposition of sanctions. *In re Marsch,* 36 F.3d 825, n. 1 (9th Cir.1994); *FDIC v. Fadili,* 165 B.R. at 60; *In re Collins,* 250 B.R. 645, 656 (Bankr.N.D.Ill.2000); *In re McBride Estates, Ltd.,* 154 B.R. 339, 342 (Bankr.N.D.Fla.1993); *In re Whitney Place Partners,* 123 B.R. 117, 121 (Bankr. N.D.Ga.1991); *In re HBA East, Inc.,* 101 B.R. 411, 418 (Bankr.E.D.N.Y.1989).

While this reluctance may be understandable, the conclusion is open to question. In this Circuit, the courts have fre-

---

**8.** It has since been remanded to the state court.

**9.** The debtor argued that it had never assumed the Note or Deed of Trust, and was not personally liable for the mortgage or related expenses. However, section 1111(b) of the

Code gives Chase a deficiency claim against the debtor's estate even in the absence of privity between the debtor and Chase. *In re 680 Fifth Avenue Assocs.,* 29 F.3d 95, 97–98 (2d Cir.1994).

quently applied the same standards to dismissal/conversion motions and sanctions motions based on bad faith. For example, in *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222 (2d Cir.1991), a sanctions decision that is discussed in more detail below, the Court considered when a chapter 11 filing would be deemed frivolous under former Rule 9011. The standard it adopted was based, in large part, on the test enunciated in *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989), a leading case that addressed the criteria applicable to bad faith dismissals, as well as the sections of COLLIER ON BANKRUPTCY that dealt with motions under 11 U.S.C. § 1112(b) to dismiss bad faith chapter 11 filings. *See In re Cohoes*, 931 F.2d at 227–28. The *Cohoes* standard, in turn, was relied on in *In re C–TC*, 113 F.3d at 1310, where the Court of Appeals affirmed the dismissal of a chapter 11 petition filed in bad faith.

■■ In the end, the difference may lie in the standard of proof. On a motion to dismiss under § 1112(b), the movant must establish "cause" by a preponderance of the evidence. *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir.1994); *In re AdBrite Corp.*, 290 B.R. 209, 218 (Bankr. S.D.N.Y.2003); *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr.S.D.N.Y.1995). As discussed below, the evidence of sanctionable conduct must be "clear" or "substantial." Here, the same factors that led to the conversion of the case also support the imposition of sanctions, even under the higher standard.

**B. Sanctions Under FED. R. BANKR. P. 9011**

**1. The Standards Under Rule 9011**

■ With certain exceptions, every petition, pleading, written motion or other paper presented to the court must be signed by the party's attorney, and if the party is *pro se*, by the party himself. FED. R. BANKR. P. 9011(a). Since a bankruptcy petition must be verified, FED. R. BANKR. P. 1008, the petition must be signed by a person with personal knowledge of its contents as well as by the attorney for the debtor. Here, Sanford verified the petition and Weiner signed on behalf of his firm as the debtor's attorney.

By signing the petition, Sanford and Weiner made certain representations. Under Bankruptcy Rule 9011(b)

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

■ Rule 9011 parallels Rule 11 of the Federal Rules of Civil Procedure, and the jurisprudence under Rule 11 informs the interpretation and application of Bankrupt-

cy Rule 9011.[10]  *In re Highgate Equities, Ltd.*, 279 F.3d 148, 151 (2d Cir.2002).  Rule 11 "establishes an objective standard, intended to eliminate any 'empty-head pureheart' justification for patently frivolous arguments."  FED. R. CIV. P. 11 advisory committee's note (1993).  The decision whether to impose sanctions for a violation of Rule 9011 is discretionary, 10 COLLIER ON BANKRUPTCY ¶ 9011.07[1], at 9011–19, and if exercised, sanctions may be imposed against the law firm as well as the attorney within the firm that signed the pleading.  FED. R. BANKR. P. 9011(c)(1)(A)("Absent exceptional circumstances, a law firm shall be held jointly responsible for the violations committed by its partners, associates, and employees.");  *see Sangui Biotech Int'l, Inc. v. Kappes*, 179 F.Supp.2d 1240, 1244–45 (D.Col.2002);  *Prim v. Peatco Ltd., L.P.*, 90 Civ. 7272, 1995 WL 447648, at *1 (S.D.N.Y. July 27, 1995).

The leading decision concerning the imposition of sanctions for filing a petition in bad faith is *In re Cohoes*.  Construing substantially similar language in a prior version of Rule 9011,[11] the Court stated that "[a] petition may be deemed frivolous if it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings." 931 F.2d at 227;  *accord In re C–TC*, 113 F.3d at 1310.  A court "should conclude that a debtor has no demonstrable intent to reorganize only if, upon considering the totality of the circumstances, there is substantial evidence to indicate that the debtor made a bad faith filing."  *In re Cohoes*, 931 F.2d at 227.  While filing a bankruptcy petition with the intent to frustrate creditors does not, without more, establish the absence of an intent to reorganize, *id.* at 228, "an entity may not file a petition for reorganization which is solely designed to attack a judgment collaterally—the debtor must have some intention of reorganizing." *Id.; accord In re C–TC*, 113 F.3d at 1310.  Lastly, "[a]lthough a debtor need not be *in extremis* in order to file such a petition, it must, at least, face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future." *In re Cohoes*, 931 F.2d at 228.

### 2. The Violations of Rule 9011

The movants established by clear evidence that the petition was filed for an improper purpose.  The totality of the circumstances show that the transfer was contrived to save the Property, and had nothing to do with the debtor or any business that the debtor might conduct.  Instead, the transfer was the necessary prelude to the filing of the chapter 11 petition, and the petition was the linchpin of a plan orchestrated by the debtor and its counsel with one purpose: to frustrate Chase's legitimate right to foreclose.

The debtor had not operated for several years.  It did not have financial problems until the transfer.  Although the schedules listed debts to professionals, the debtor

---

10.  The "safe harbor" provision in Bankruptcy Rule 9011(c)(1)(A) does not apply if the bad faith relates to the filing of the petition since the filing has immediate, serious consequences and there is no absolute right to withdraw a chapter 7 or chapter 11 petition. 10 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 9011.06[1][b], at 9011–17 (15th rev. ed.  2004)("COLLIER").

11.  Like the present version, the earlier version authorized the imposition of sanctions where the pleading was not well-grounded in fact or warranted under existing law or a good faith argument for the extension, modification or reversal of existing law, or was "interposed for an improper purpose, such as to harass, to cause delay, or to increase the cost of litigation" *In re Cohoes*, 931 F.2d at 227.

never suggested that the case was filed to deal with these debts, or that it would ever be necessary to file a bankruptcy to deal with the debts. Instead, the sole purpose of the transfer was to save the Property. According to the unsworn *Affidavit of Steven Sanford, President of Debtor Intercorp International, Ltd.*, dated November 17, 2003, at ¶ 7 (ECF Doc. # 4):

> One of the objectives this chapter 11 bankruptcy reorganization proceeding is to enable the Debtor, who has also funded nearly all of these litigations of more than $500,000.00, to consolidate the actions against the lender and stay a foreclosure of the Property. I believe that the facts and law support the Debtor's position, including that for additional reasons as well, there is no amount owned by the Debtor nor its affiliates to the Lender. The Property is presently valued at approximately $2.5 million. Alleged interest and principal due is approximately $1.5 million. The prevailing party may be entitled to legal expenses.

The timing of the transfer was plainly intended to prevent the foreclosure following the California plaintiffs' unsuccessful efforts in state court to prevent the sale. The debtor and its affiliates had sued Chase and its affiliates in California to prevent the non-judicial foreclosure. After several years, a trial and numerous court rulings, Chase had prevailed. The transfer was perfected as the California court was about to sign the judgment in favor of Chase, paving the way for the non-judicial foreclosure.

The filing stayed the sale, but did not stay the entry of judgment. The debtor was the plaintiff in the California action, and the automatic stay did not apply. To forestall the entry of the judgment, the debtor removed the action to the California bankruptcy court. *See* FED. R. BANKR. P. 9027(c)(upon filing of the notice of removal

in the non-bankruptcy court where the litigation was pending, "[t]he parties shall proceed no further in that court unless and until the claim or cause of action is remanded"). The debtor and its counsel could not have reasonably believed that the removal would serve any legitimate purpose, or that there was anything for the bankruptcy court to do except remand the case, which is precisely what happened. The only remaining thing to be done was the entry of judgment by the state court.

Having lost in state court but successfully prevented the entry of judgment and stayed the foreclosure, the debtor executed the final part of its plan. It commenced an adversary proceeding in this court for the purpose of relitigating the issues that it had lost in California, and collaterally attacking the results of that lawsuit.

The filing of the petition was, of course, the key. Without a chapter 11, the debtor could not stay the foreclosure, remove the California litigation or commence the adversary proceeding. The chapter 11 case served no other purpose. The debtor had not operated for years, had no business, and until the Property was conveniently parked on the debtor's balance sheet, had nothing to do with the Property. Although the debtor had been a party to the California and New York litigations involving the Property, apparently on the theory that it held a lease in the Property, no lease was ever produced. This is not surprising since the lease was supposedly entered into in 1979, but the debtor was not incorporated until 1993. Furthermore, it is beyond dispute that whatever the debtor's business might have been in the past, or might be in the future, the Property played no part in it.

What, then, was the debtor's plan for this reorganization, its intent to reorga-

nize? Its plan was one of convenience without substance. According to the unsworn *Affidavit of Steven Sanford in Opposition to Motion to Convert, Modify the Automatic Stay, or Dismiss,* dated January 30, 2004 (ECF Doc. # 25), the plan for the debtor's rehabilitation was the following:

> The Debtor's business has been dependant on the time that I have been able to devote to Debtor's projects, which are mainly financial transactions, acting as an advisor and/or acting as a principal. I have only been minimally available to the Debtor since 1997. I have agreed to devote my full time to Debtor through the confirmation of the Debtor's Plan of Reorganization, without compensation, as well as invest additional assets into Debtor, and cause SCS and its subsidiaries to invest additional assets into Debtor, all solely in consideration of shares of common stock, to assist Debtor to fulfill its Plan.

(*Id.,* ¶ 4.) In short, the debtor's "plan" was for Sanford to devote time to its business after ignoring it for over six years.

The debtor had no concrete business plans or expectations because up until the transfer of the Property, it had no plan to engage in any business. Consequently, its entire future was premised on Sanford's past successes. His affidavit contains a litany of his supposed credentials and accomplishments with virtually no specific information. For example, Sanford claimed he "founded and was chairman of a company I built from zero to $280 million in annual revenues through over 20 mergers and acquisitions," (*id.,* ¶ 7), but never identified the company. He also boasted that "I have served my country as advisor to the White House (where I convinced a President to change economic policy), and as advisor to two Cabinet Secretaries. I was also an advisor to a Prime Minister, Deputy Prime Minister and a Finance Minister of post-communist Russia." We are left, however, to speculate on the identities of the President, Cabinet Secretaries and foreign leaders who he served.

The debtor's Chapter 11 Plan (the "Plan"), filed February 2, 2004 (ECF Doc. # 30), put little meat on these bare bones. In substance, the debtor proposed to pay 100% of the allowed claims over time, although it continued to oppose Chase's secured claim for the reasons previously rejected by the California court. (Plan, Art. II, ¶ 2)("The Class 1 creditor, an affiliate of J.P. Morgan Chase & Co., claim is objected to as waived by violation of California (ii) Code of Procedure 726, and otherwise.") The debtor offered the same visionary hope for implementing the Plan:

> The proceeds necessary for the satisfaction of creditors' claims will come from proceeds from the litigations refinancing or sale of the Property, and consulting fee income of the Debtor as a result of the efforts of Steven Sanford, the beneficial indirect owner of Debtor. Mr. Sanford has generated over $6 million cash in such fees for other entities since 1988.

(Plan, Art. III.) The debtor failed to file a disclosure statement at the same time as the Plan, despite the requirement to do so. FED. R. BANKR. P. 3016(b)("a disclosure statement under § 1125 . . . of the Code shall be filed with the plan or within a time fixed by the court"). Hence, the litigations, prospects for the sale or refinancing of the Property and the sources of the consulting fee income were never explained.

In the end, the debtor and its attorneys paid lip service to the requirements of the Bankruptcy Code, but little more. The timing of the transfer of the Property and the filing of the chapter 11 petition, followed by the litigation steps to rob the

California court of its jurisdiction and its rulings of their effect appear to have been intended, and were intended, to protect the Property—where Sanford lives rent free—or delay the inevitable for as long as possible. If the debtor had a sincere desire to reorganize, it would have recommenced business operations prior to acquiring the Property which, as noted, played no part in its earlier operations or future plans.

Accordingly, the Court finds that the petition was filed for an improper purpose. FED. R. BANKR. P. 9011(b)(1). The debtor commenced this case to collaterally attack the judgment of the California court, and prevent the foreclosure of the Property and the eviction of Sanford from his home. In addition, "there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings." *In re Cohoes*, 931 F.2d at 227. It had not engaged in business for years, and failed to identify any prospects. Sanctions are therefore warranted under Rule 9011 against the debtor and Sanford, who signed the petition on behalf of the debtor, Bruce Weiner, Esq., who also signed the petition, and Rosenberg, Musso & Weiner, LLP, Weiner's employer.

## 3. The Nature and Amount of the Award

■ The purpose of the sanction is to deter a repetition of the offending conduct rather than to compensate the party injured by the improper conduct. Under Rule 9011(c)(2):

A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

(A) Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2).

(B) Monetary sanctions may not be awarded on the court's initiative unless the court issues its order to show cause before a voluntary dismissal or settlement of the claims made by or against the party which is, or whose attorneys are, to be sanctioned.

Chase understandably seeks all of its attorneys' fees and expenses incurred in connection with its alternative motion to dismiss, convert or for relief from the automatic stay, which resulted in the conversion of the case, and the sanctions motion. That may or may not be appropriate. Accordingly, Chase is directed to submit an affidavit within two weeks of the date of this opinion, setting forth, in detail, its excess costs, expenses and attorneys' fees. Its submission should be accompanied by contemporaneous time records.

The debtor and its counsel will have two weeks to respond in writing, and at that time, may submit their arguments regarding the nature and amount of the sanction. Chase will have one week to reply.

## C. The Other Bases For Sanctions

In light of the Court's determination that Rule 9011 provides an adequate basis to deal with all of the sanctionable conduct, it is unnecessary to consider whether sanctions would also be appropriate under the Court's inherent authority or 28 U.S.C. § 1927. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50, 111 S.Ct. 2123, 115

L.Ed.2d 27 (1991) ("when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power"); *see generally* 2 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 11.41, at 11–75 (3rd ed.2004).

So ordered.